JELLICO GROCERY CO. *et al. v.* HENDRICKSON.

(*Knoxville,* September Term, 1937.)

Opinion filed Nov. 27, 1937.

WILLIAMS, WINSTON & GUINN, of Johnson City, for Jellico Grocery Co. and others.

MILLER, MILLER & MARTIN, of Johnson City, for Lon Hendrickson.

MR. JUSTICE DeHAVEN, delivered the opinion of the Court.

This is a case brought under the Workmen's Compensation Law of Tennessee (Code, section 6851 et seq.). From a decree awarding compensation, the employer has appealed to this court and assigned errors.

The petitioner, Lon Hendrickson, was employed as a rural salesman by defendant, Jellico Grocery Company, for many years. In the late afternoon of March 2, 1936, while ascending the front steps of his residence in the town of Elizabethton, he fell and fractured his left leg. He had spent that day out in his territory taking orders for defendant. He was unable to write up the orders in proper form at the customers' places of business because of a condition referred to by him as hand paralysis. He could not write legibly. Due to this condition, he wrote the orders obtained by him on a pad, and on returning home the orders were written out in proper form. He left home of mornings, to go to his field of work, before defendant's place of business was open and returned after it was closed. After the orders were written up, on the following morning they were left at a lunch stand to be taken up by defendant.

At the time of the accident, petitioner had in his possession certain orders obtained by him during the day and some cash collected.

Petitioner regularly returned home after the day's work. His family consisted of his wife and two children, a daughter and a son. He ate and slept at home. On the day in question he returned home about 5 o'clock in the afternoon and went to the kitchen door and found it was locked. He then went around the house to the front and started to ascend the steps, which were of stone, when he slipped on a piece of ice and fell.

It is the position of petitioner that he had been "instructed" by defendant to write up the orders at home; that this was a necessary part of the service to be rendered; and that he was going home to write up the day's orders. The insistence is that the injury was the result of an accident arising out of and in the course of petitioner's employment. The trial judge accepted the theory of petitioner and found accordingly.

It is shown in the proof that Dan Fulks took charge of defendant's business, at Elizabethton, as manager, on January 16, 1936. He testified that when he came to Elizabethton petitioner was writing up his own orders in his own home in his own handwriting. Fulks testified, in part, as follows:

"Mr. Hendrickson was rural salesman. He was never in our office except on Saturday and it was customary for him to have order blanks and he would carry the order blanks home, and when I came here he was writing up all his own orders at home. Along in January he commenced having shortages lost stuff. People didn't get what they bought. I realized that it was because of Mr. Hendrickson's penmanship. He just couldn't write

so anybody could read it. His daughter had just finished a business course, and I asked him if he wouldn't get her to write up the orders at home. He said he would do so if it would be all right with me, and he did that until she got a job somewhere and then one or two others would write them, I think his son and his wife wrote them up after the young lady got a job. But I never saw him from one Saturday till the next."

He further testified:

"I asked him to have the orders written up at home by one of the family because we just couldn't read his writing at all. And there wasn't any other place for him to write them."

Again:

"Q. Where did the company instruct him to do that work? A. You speak of work; do you mean where did we instruct him to write up the orders? Q. That's exactly it. A. As I stated before, I instructed him to have them written up at home."

Further along, he testified as follows:

"Q. Mr. Fulks, as I understand you, when you first came to Elizabethton, Mr. Hendrickson was writing up his own orders at his home in his own handwriting? A. Yes sir. Q. And you objected to the character of handwriting; that is true? A. Yes sir. Q. And you told him to get somebody else who could write a legible hand? A. Yes sir. Q. You didn't care who it was so long as they had a legible hand? Is that right? A. Well, I suggested that he have his daughter do that. We would probably use her in our office as soon as we could get an opening for her and wanted her to know how it was done. Q. All you required was a legible hand? A. No, I told him to have Miss Frances do it because our

stenographer was getting married and we expected to put her to work. Q. After Miss Frances did get another job, you did not object to his wife writing up the orders? A. No. Q. And you didn't object to his son writing them up? A. I did not object to his writing them up instead of Miss Frances; but I merely suggested that she write them. Q. All you required in writing them was a legible hand? A. Yes. Q. It would make no difference whether they were written at his home or anybody's home? A. No, sir, it made no difference to me. Q. It made no difference whether they were written up at his home or taken down where his daughter worked and had them written there? A. No sir. Q. Did you have any control over his home there? A. No sir. . . . Q. If Mr. Hendrickson had written a legible hand, you had no objections to his writing them up at the place of business of the customer, did you? A. No sir. Q. If he had taken them down and had them written up on a typewriter by a stenographer, you would have had no objection to that? A. I don't know, it would depend on how they came off; what they looked like. Q. If they had been written efficiently and legibly that was all you wanted? A. Sure. I wanted them so we could fill them properly.''

On redirect examination, Fulks was asked:

''Q. Mr. Fulks regardless of whether you would have accepted or might have accepted it otherwise, did you or not positively instruct Mr. Hendrickson to dictate the orders at home? A. Well, I knew Mr. Hendrickson was writing the orders up at home. I knew that was the most convenient place for him to write them up, when he was writing them himself, and I merely told him I would appreciate it if he would have somebody else

write them up, because we were having so much trouble with them, because we could not get by with them, and I just suggested that Miss Frances write them up until we had an opening for her at the office.''

Fulks testified that salesmen did as they pleased as to the place where they wrote up orders, ''but most of the men wrote up the orders after they got home.''

Petitioner testified that he had never had a desk at defendant's place of business and ''didn't need one.'' ''Never would go to the office, but I come right straight home during the week, and then go to the office on Saturday morning for instructions.'' His counsel asked him:

''Q. As manager of the Standard Grocery Company, Mr. Fulks instructed you to just wait until you got home at night before completing your orders? A. Yes, he instructed me to make my office here and have my folks do the writing, thinking all the time maybe my hands would get better.''

Further along, he was asked:

''Q. Did Mr. Fulks tell you which member of your family he wanted to write up your orders? A. He got a sample of all their writing, and he then said he would just as soon have one as the other. Q. All he wanted was plain handwriting? A. Yes. Q. He was not particular whether it was a member of your family wrote the orders up or someone else? A. No. Q. Just so long as it was clearly written? A. That's right. . . . Q. Before your hand began to give you trouble, was or not it your custom to write the orders right at the place of business? A. I did that for a while, but it took me too long, I found I couldn't do it and see my trade. I always knew how many merchants I was go-

ing to call on that day. . . . Q. How long had Mr. Fulks been manager of the Standard Grocery Company (which became the Jellico Grocery Company)? A. Since last January as a year ago. Q. And he was the first one who suggested that you have someone else write these orders up for you? A. No, I believe Mr. Dungan was the one who first suggested it.''

Petitioner testified that the orders were written up in his house, sometimes before supper and sometimes after supper.

The trial judge found as follows:

''The petitioner had been instructed by the employer to work up his orders at home, and had been working them for a considerable period of time. This was a necessary part of the service to be rendered. If the orders was not made up, his day's work would go for naught. He was on his way home, and upon his own premises when he slipped and fell. This was a risk such as he was exposed to in the usual course of his employment.''

We think it perfectly evident that petitioner would have gone home on the day in question, regardless of whether he had taken any orders during the day or not. His going home was not in the course of his employment by defendant, but was in the course of his obligation and duty to return to his home and family for the night. It is true that he also had the intention of having his wife or son write up the orders, but his presence on the steps had relation to his return to his family and home.

The testimony of Fulks, witness for petitioner, abundantly shows, we think, that defendant had no particular interest where the orders were written up. All they in-

sisted on was that the orders be legibly written, whether done at petitioner's home or elsewhere. Stress is placed on the following testimony of Fulks, heretofore quoted, but here repeated:

"Q. Where did the company instruct him to do that work? A. You speak of work; do you mean where did we instruct him to write up the orders? Q. That's exactly it. A. As I stated before, I instructed him to have them written up at home."

This isolated portion of testimony, however, must be taken and understood with what the witness said before and after making the above statement. We think it is perfectly plain from the testimony of Fulks that petitioner was not, in fact, required by the company to write up the orders at his residence. All that the company wanted was orders which could be read. The place where the writing was done was immaterial to the company. According to Fulks, most of defendant's salesmen wrote up the orders after they got home.

Petitioner's residence was not defendant's place of business, nor was it a place that defendant required petitioner to go. The accident in question did not take place on or near defendant's place of business, nor was petitioner on his way to or from such place of business. He was at home, on premises under his exclusive dominion and control, and with which defendant had nothing to do.

Counsel for petitioner rely on *Tennessee Chemical Co.* v. *Smith,* 145 Tenn., 532, 238 S. W., 97, and *Little* v. *Johnson City Foundry & Mach. Co.,* 158 Tenn., 102, 11 S. W. (2d), 690. In the first of these cases it was held that a servant who fell into a reservoir and was drowned while washing up preparatory to going home, accord-

ing to custom, died as the result of an accident arising out of and in the course of his employment. In the second of the two above cases the court stated that the general rule is that an injury to an employee on his way to or from his work, away from his employer's premises, does not arise out of his employment; that where there appears nothing to indicate a choice of way in going to work, required by the employer, and the employee selects a way of his own choice and is injured, the accident does not arise out of his employment. The case of *Central Sur. & Ins. Corp.* v. *Court,* 162 Tenn., 477, 36 S. W. (2d), 907, is also relied on. It was there held that an employee required to report to the employer's principal office, and who while en route and near the office of her employer fell upon the street and suffered injury, such accident arose out of her employment.

Petitioner also relies on *American Casualty Co.* v. *McDonald,* 166 Tenn., 25, 57 S. W. (2d), 795, where it was held that injury to an emergency repairman for a bicycle shop, from collision while making a detour for the accommodation of others, and when returning to the employer's shop on the employer's motorcycle, did not arise out of and in the course of his employment.

We have considered the above and other cases cited by petitioner and find that they are not analogous to the case at bar.

In *Industrial Commission* v. *Gintert,* 128 Ohio St. 129, 190 N. E., 400, 402, 92 A. L. R., 1032, it was held that injuries sustained by a teacher in the public schools while traveling from her home to the school building where she performed her duties as an instructor were not compensable, notwithstanding such teacher did some work in her own home preparatory to or connected with

the performance of her duties in the schoolroom. The court said, *inter alia:*

"The claim is based entirely upon the theory that while at her home she did some work in preparation for her school duties, and therefore she was in the course of her employment not only while in the school building, but while traveling from the school to her home, and while in her own home and also while en route back to school. It would follow from an application of that theory that the workmen's compensation fund would become a general insurance fund covering accidental injury or death of such employee whatever the cause and wherever and whenever it may have occurred. Payment would thus be required in this case had the injury been caused by a fall or otherwise in the decedent's own home. . . . If there can be a recovery under the facts in this record, then there could be a like recovery in the case of any clerk, stenographer, bookkeeper or of any other employee employed in an office, bank, store, factory, or other place of employment who carried home any books, papers, statements, etc., for any purpose at all connected with his duties, and sustained an injury while absent from the place of employment and while engaged in some act not in any wise connected with the duties of the employment."

The court in the above case reversed a contrary holding in *Inglish* v. *Industrial Commission,* 125 Ohio St., 494, 182 N. E., 31, 83 A. L. R., 210.

██ An injury arises out of the employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the injury and the employment. *Scott* v. *Shinn,* 171 Tenn., 478, 105 S. W. (2d), 103. We are unable to

see any causal connection whatever between the accident suffered by petitioner and his employment. Furthermore, his employment did not require or make necessary that he go to the place of the accident.

Petitioner had been a faithful employee of defendant for many years. His accident is most regrettable. However, under the applicable rules of law, we find it necessary to reverse the judgment of the trial court and dismiss the suit. Petitioner will pay the costs of the case.